Alright, this court is now in session. You may be seated. The clerk will call the next case. Case number 315-0526, Emerald Performance Materials, LLC, found by Thomas Dimond v. Illinois Pollution Control Board and Illinois Environmental Protection Agency, as released by John Schmitt. Mr. Dimond, you may proceed. May it please the court, Mr. Schmitt. My name is Tom Dimond. I represent the petitioner Emerald Performance Materials. EPM is the sole remaining United States producer of a key product for the manufacture of rubber, which is a strategic national product. Because of the uniqueness of Emerald's process, its wastewater contains high levels of ammonia. The Illinois Pollution Control Board has twice found that those unique characteristics were not considered when the general ammonia effluent standard was adopted. The board has also twice found that the ammonia emitted by the Henry plant poses no greater danger to the environment or to health than compliance with that general standard. That is why the board granted an adjusted standard to Emerald Performance Materials. Having an adjusted standard is critical to the continued operation of this plant. It is equally important that the conditions of the adjusted standard be reasonable and achievable. This appeal challenges three of the board's conditions precisely because they are not achievable or are unreasonable or otherwise are beyond the board's power. The board overstepped its authority and those conditions should be reversed. The first condition that we challenged is a condition that requires Emerald to essentially negotiate with agricultural sources, essentially farmers, to reduce their ammonia emissions as an offset for the ammonia emissions from the Henry plant. There are basically three problems with that condition. The first is that in adopting that condition, the board considered the draft nutrient loss strategy published by the Illinois Environmental Protection Agency and the Department of Agriculture, the Illinois Department of Agriculture. But the only reference to that document in the entire record is in two or three pages of the board's opinion. The board gave no notice to Emerald or to any other party to the proceeding that it was going to consider that document and essentially take official notice of it. I say essentially because the board never even discussed in its opinion whether or not it could take official notice of it, but it discussed that document in its opinion and did so without notice to Emerald or any other party. That violates fundamental notions of due process, it violates the Illinois Administrative Procedures Act, and it is squarely contrary to ruling of this court almost 40 years ago in the Caterpillar case. In Caterpillar, Caterpillar was seeking a variance from the Pollution Control Board. In deciding not to grant that variance, the board considered an air quality document report from the agency. It gave Caterpillar no notice that it was going to do that, it just did it. And when the case got up to this court, among other reasons for reversing, the court said it is fundamental that if an administrative agency is going to take official notice of a document and rely upon it in issuing its decision, it must give the parties before the administrative agency notice of that document and an opportunity to rebut the facts that are set forth in that document. That is exactly what the board has done now almost 40 years later. They took this draft nutrient loss reduction strategy, they made it the basis of their decision, they gave no notice to anybody that they were going to do that, they gave Emerald no ability to rebut the facts that were in that document. Caterpillar is squarely on point and requires reversal of the board's decision, if for no other reason than just that. The state doesn't really have a response to Caterpillar. So it tries what I guess I would call collateral attacks. First it says, well, the hearing officer asked Emerald some questions about possibly doing an offset condition. True enough, the hearing officer did, 15 months at least before the draft nutrient loss strategy was even published. Those questions cannot be noticed that the board was going to take account of the draft nutrient loss strategy. Then the state says, well, you know, the draft strategy is just a minor report. It's not a minor report. It's almost 100 pages. It's published in color. It was officially put out for public comment. It's got the seals of two state agencies on it. It is not a minor report. And what makes it most major is that the board wrote about it for two or three pages as the basis for condition 2H. Finally, the state says, well, what about the Echo-Glaco case? That case is really the analogous case, not Caterpillar. But that's just not true. In Echo-Glaco, the document that was under consideration had actually been introduced into the record, and the parties had an opportunity to rebut the facts in that document. Caterpillar is the case that is on point and requires reversal. The second problem with the agricultural offset condition is that it exceeds the board's authority. It is written in a way that what it says is it is a condition of Emerald applying for a renewal of the current justice standard that was issued in 2015 that it achieved these agricultural offsets. That exceeds the board's authority because the standards for granting an adjusted standard by the board are set forth in the Illinois Environmental Protection Act. They were established by the General Assembly. The board has no power to either detract from those requirements or to add to them, and that is exactly what this condition does. It establishes a fifth condition that Emerald would have to meet at some point in the future if it needs to apply for a renewal of the adjusted standard. What is that offset strategy? I'm trying to find it here. I don't see an index. It's in our appendix. Yeah, I know. I don't know which number tab it is. So what is it? What is the document? It is a... Well, tell me. Sure. In English that an ordinary guy can understand. Sure. The Draft Nutrient Loss Reduction Strategy is a strategy that Illinois EPA and the Department of Agriculture came up with to attempt to reduce ammonia emissions discharged into Illinois waterways. It is intended to address a problem at the Mississippi Delta in the Gulf of Mexico. The hypoxia. The hypoxia. Oh, yeah. So this strategy was adopted by the two Illinois agencies to contribute to that along with strategies that are being adopted by other states that discharge into the Mississippi Delta. Under WOTUS, Waters of the U.S. Yes. It's the federal legislation. Yes. Okay. So how does this pertain to Emerald? They're not in the agricultural business. Exactly. That's your argument, isn't it? We are not in the agricultural business. And, you know, there are several reasons why this condition exceeds the board's authority. One is that they never considered technical feasibility or economic reasonableness, which they are required by the statute to do. They're required to consider those factors when they adopt a rule. And Section 28, the Section on Adjusted Standards, incorporates Section 27, which is the section of the Act dealing with the adoption of rules. And so Section 28 also requires the board to consider technical feasibility and economic reasonableness when they're imposing conditions for an adjusted standard. Because it's that those considerations are brought in. Well, we've got two industries. Correct me if I'm mistaken. We've got your industry, which is a unique, you know, special industry, which is why it's given these adjusted standards, correct? You said so at the outset. Yeah, I mean, you know, we prioritize. There are sinners and then there are sinners, okay? Depending on the value of the sinner, okay? That's what we've got. Because basically you can put 50 times more out there, right? Roughly, yes. Yeah, that goes in the Illinois River, okay? As opposed to standards of the farming or ag industry. Actually, the farming and ag industry do not have any standards. Not yet. They may not even have any standards under the draft nutrient loss reduction strategy. Okay, fair enough. Agricultural sources are what are called under the Clean Water Act non-point sources. And in general, it's much, much harder for the agencies to regulate non-point sources. So basically they get a pass because they're farmers. Right, exactly. But you're a point source. But we are a point source. And so you're saying that to get that adjusted standard as a point source, you have requirements that were put upon you, correct, that had to be reviewed and a report made. Yes. And they were saying such as do your best efforts to make this technology reduce the amount of effluent of ammonia going down the river, right? Yes, and to our specific point source, there's actually a numeric standard. Correct. Numeric standard is 3 milligrams per liter on an average basis. Right, but you got an adjusted that went up quite a bit. We got an adjusted standard that takes us up to 140. Which arguably is because of the nature of the technology that you have to employ to produce your product. Yes. Okay, and so you get a pass on that, right? So to speak. We don't get a whole pass, but we get a higher standard. Right, but the whole idea of this order was, yes, you can do this, but we want you to continue to try to come back down to a standard, a point source standard that's less polluting. Yes, and the board can certainly impose conditions to try to get us back down. And some of their conditions required us to try to study new additional technologies to try to get that number lower. We have no problem with those requirements. We think that those are pretty standard, things that the board does all the time and are well within the board's power. But this offset condition is something different. Yes, let's explain that offset in ordinary terms. What is it? Basically what they want us to do is to somehow negotiate with the farmers to reduce their emissions of ammonia as an offset for our emissions. Because they're looking at the Illinois River Basin as one entity. They're actually looking at the entire Mississippi River. Yes, all the way down. All the way down to the Gulf of Mexico. Even though there's no federal program that establishes anything requiring farmers or anybody else to do anything regarding the Gulf hypoxia problem today. Right, because of waters. We're the only ones. Yes. We're the only ones who have been singled out to somehow be able to solve this problem. Believe me, however much our ammonia emissions are, we are an infinitesimal drop in the bucket in the problem in the Gulf of Mexico. Right. So one of the problems with this agricultural offset condition, in addition to the procedural problem, is that it's written in a way that is beyond the board's authority. Because it establishes additional conditions for a renewal. Another problem is that the board never considered the technical feasibility or economic reasonableness of that condition, which they are required to do by the statute. A third problem... Some of the things that are in that study were included and encompassed in some of the questions that were sent and that you responded to and said, yes, we considered them, but they are not economically feasible. So they had your responses to some of those... They had our responses to the specific questions that were asked by the hearing officer. And the hearing officer questions are in the record, but basically what the hearing officer was asking is, do you think you could do some sort of an offset program? And we responded and said, no, we don't think that that's feasible. When the agency was asked the same question, their response was, we don't think there's enough potential offsets in the entire Illinois River, Sennac line water basin to offset the enrolls. We don't think... The agency said, we don't think there's any. So if the board actually had considered technical feasibility and economic reasonableness, the only conclusion they could have reached on the record was that this condition can't be satisfied. You can't buy up all the land there and put it... According to the agency, even if we did, it wouldn't be enough offsets for our district. Because you're 50 times above. Because we're 50 times above in the amount of water we discharge. So those are the reasons why the agricultural offset condition is inappropriate. We also challenged the condition that requires us to have an ammonia metric in our employee bonus program. That is likewise beyond the board's authority. The board's authority is to impose environmental conditions, not employee compensation policies. The Village at Lombard case I think is squarely on point here. It's a case where the Illinois Supreme Court said, look, you can't reorganize municipal government to... Even if it's intended to achieve an environmental good, the General Assembly didn't give you that power. Likewise, the General Assembly did not give the board power to set compensation policies. They just didn't. And the state's argument that, well, there's no express limitation in Section 28 that says the board can't establish an employee benefit policy doesn't wash here. Because administrative agencies are creatures of statute. Their powers are limited by statute. There has to be an affirmative grant of power in the statute. The agency can't simply say, well, the General Assembly didn't say we couldn't. If an agency could say that, they'd have power to do anything. There's nothing in Section 28 that says that the board couldn't put on a condition that says you have to waive your right to counsel as a condition of getting this adjusted standard. But presumably we would all agree that they don't have that power, even though it's not expressly limited in Section 28. I have a follow-up question. Sure. Are you saying point blank they don't have the power to establish conditions for this variance? Oh, no, Your Honor. They clearly have power to establish some conditions. I don't think they have any power to establish a condition about employee compensation policies. That, I think, is far beyond their power under the statute. Thank you. Thank you, Mr. Diamond. Mr. Schmidt. Thank you, Your Honor. May it please the Court. I'm John Schmidt on behalf of the Environmental Protection Agency and the Pollution Control Board, and we ask for affirmative of the board's order. And this case touches on the authority of the board in imposing conditions on adjusted standards. Adjusted standards exist because the General Assembly recognized the need for great flexibility, or at least for some flexibility, in terms of applying rules. That there might be a company like Emeril for whom it would impose a great hardship for the reasons that have been discussed. By the same token, though, it's also important to recognize that the board should have flexibility in imposing conditions. And the legislature did, specifically in Section 28.1, give the board authority to impose conditions that are consistent with the purposes of the act. Now, the check that exists on the board in doing that is that those conditions cannot be arbitrary and concretious. We would submit that the conditions imposed here were not, and obviously Emeril disagrees. I want to start by explaining the offset condition somewhat. And I realize that it's a very unique condition, and the rationale for imposing that condition. Ammonia discharges harm aquatic life because what they result in is oxygen depletion. And agricultural producers, when they have runoff of nitrogen from fertilizers into lakes and rivers, that also results in oxygen depletion when there's too much nitrogen. But isn't part of the proper reason there's no rules for farmers is because it's difficult or impossible to measure the amount that's running off, right? I think that's part of it, Your Honor. And so how do you go out and offset against this undeterminable amount? You say, I've got 10 farmers with so many acres or 1,000 farmers with this many. You're asking somebody to go, how in the world could you know what the offset was when you can't measure the amount of nitrogen runoff from these farmers you're negotiating with? I believe there are ways of at least trying to estimate it through taking readings from the water that the nitrogen runs off into. I mean, you know the amount of ammonia that's in the water. You just don't necessarily know what farm field it came from, right, because of the way it runs off through the drainage tile. I think that often that's true, Your Honor. I believe often that's true. But the idea is what the condition requires is for Emeril to initiate a program that would have a reasonable opportunity of achieving, of offsetting basically 45% of the discharges that it puts into the river. But back to Justice Smith's point. Let's say, you know, okay, the goal is that I reduce somewhere along this Illinois River Basin 45% of what I am discharging, correct? Right. Okay. How do you do that? How do I know whether I've got to buy 4,500 acres of ground or lease 4,500 and not put anything on it? Or I put up levees, water collection facility and treatment facilities from these agricultural industries? How do I know that when I don't know what the amount of discharge is per acre? I think one thing that helps is sometimes bringing environmental consultants in to help explore what would need to be done and what the nutrient strategy... So the burden then shifts to the regulated, so to speak, okay, Emeril, to retain experts, to put together a plan, and to report the plan to the PCB to justify these adjusted standards. Is that correct? It would shift to them. If it proves too burdensome, then they would make the argument that this is too burdensome for our industry to support. Well, one thing that is discussed in the decision is that there are best management practices that might cost $1.30, or estimated to cost maybe $1.38 a pound, some more than that, in terms of reducing the amount of nitrogen in the waterways. And the estimates, if Emeril wanted to achieve similar reductions in ammonia, are much higher. I think the minimum was about $6.60 per pound. So the desire would be this is something that even with bringing in consultants, they could achieve at a lower cost than if they reduced their own ammonia discharges. But if this did prove too burdensome, if they tried to undertake this, and this just proved wildly unfeasible, they can ask for a variance under Section 35 of the Act from the board's order. They can go back before the board and say, look, this can't be done. Please change your adjusted standards. And that would be one possibility of gaining... Well, would it be unreasonable to say that it's infeasible at the outset, because they're asking Emeril to measure what the government has seemed to already have acknowledged is unmeasurable. I don't know if they went quite that far as to say that it's unmeasurable. Well, farmers vote, so they're getting a pass. They are, yes. And so far the rationale for them getting the pass is there's no way to know how much is coming off of green acre here versus black acre over there. Well, I think there are probably other reasons that farmers, that non-point sources are not regulated, whereas point sources are. Partially, it is that it's easier to measure. Partially, it's that point sources have, at least until recently, simply been considered more of a priority, too, for regulation. They've been considered more of a problem than non-point sources. I think recent study has realized that non-point sources are part of the situation, too, though, Your Honor. How many acres of farmland go along the Mississippi watershed between here and New Orleans, Your Honor? Well, there's quite a few, and this condition wasn't imposed with the thought that Emeril can possibly solve this problem. Of course, the idea was more to compensate for some of the ammonia that they discharge well in excess of the generally applicable rate. Basically, the concept is if I can reduce it elsewhere other than the point discharge by the amount we're allowing them to go above the standard, then there's no net change. Right, and the board didn't even go so far as to require Emeril to do that. They said offset 45%, so not even everything that they're discharging above the three milligrams per liter. So you're taking the position, basically, I think, that you've got a choice, either reduce 45% or come up with some other program that will reduce other point discharges or non-point discharges in your same area by 45%. Is that kind of just generally what the thinking was? I think that is the general thinking, but I think the way the order is phrased is also at least initiate a program that's designed to do this. At least make some effort, and one thing that was going on was... So basically, they can hire a fiction writer and make a report. You mean an expert? Oh, excuse me. I hope more of an environmental consultant or expert, but I think the board felt that it was important to initiate some effort along these lines because this has been going on for about a quarter of a century now. It's hopeless probably, but the bottom line is until you ban, okay? It's like regulating DTT until they ban it, okay? But the bottom line is, now back to the law, okay? Now I think we understand the factual basis. The argument of the appellant is that you did not comply with procedural requirements, and then substantively under the law, this couldn't be done. I think that may be my simple mind on it, but what about the procedural? You were dealing with materials that arguably procedurally were not presented under the, like the caterpillar case. Admittedly, they were never presented to Emerald beforehand. We think one distinction from caterpillar is the materials that were considered were actually used as a basis to deny the applicant the variance. Here they got the relief they wanted. The materials were, however, used to help shape this condition. They were certainly a part of that. Now they did, but that was the ultimate decision. The ultimate decision was you get adjusted standards here, but they come with a price tag conditions. Right. And were they given procedurally an opportunity to rebut those conditions? Your Honor, the one opportunity they would have had was they could have asked for reconsideration of the board's decision on this basis. They didn't do that. They didn't have to, though, did they? They were not required as a condition to appeal. That's correct, Your Honor. And we would ask if that is the sole basis of this court's determination that this condition is improper, we would ask instead of for outright reversal of the condition, remand it to the board and give Emerald, with instructions to give Emerald the opportunity that it seeks to address. Counsel has two minutes. Let me switch gears with you a second. Let's talk about this employee benefit thing. I mean, first of all, is it a little silly? I mean, couldn't Emerald comply by saying, look, if any employee comes up with an idea to help us reduce our pollution discharge, ammonia discharge, you get a Kroger's roasted chicken and your picture on the company magazine or newspaper. Admittedly, that's all it does say, Your Honor. If Your Honor has a point, all it says is that it has to be a part of the gain-sharing plan. The board, I think, was reluctant to dictate the terms too much. So, yes, it left Emerald wide discretion in determining what the reward would be. That's correct. And where do they find their authority to do anything in that regard that dictates how Emerald has got to reward its employees? Well, I think it would also be in the grant of authority to the board to impose conditions that would be beneficial to the environment. Emerald itself... Well, on its face. I mean, that would encompass anything they could dream of that would do that, right? I mean, that can't be as broad as it sounds out of context, right? But I think that's right. But also, if a condition is arbitrary and capricious, I think that's the main check on the board's authority. Here we don't think it is because Emerald itself, in its own 2010 summary report, told the board and the agency that having gain-sharing as a metric in... or having ammonia reduction as a metric in the gain-sharing plan was a key project that it was undertaking in terms of ammonia reduction. And they reported in 2013 that they were still doing it. So the board just wanted them to continue. Continue the way they were doing it. It's not where we did not come up with that out of whole cloth. Well, and arguably, I suppose any good business tries to encourage employees to come up with ideas that make the business, whatever it might be, more efficient, more profitable, more... Right. No, that's right, Your Honor. That's right, Your Honor. But if they didn't have this program to begin with, is it something that you think that you could require that they implement? Or is it just because they were already doing it and you thought it was just something they should continue? I think in the context of this case, they were already doing it. This had been a longstanding situation where, you know, where Emerald had been... generally applicable regulation and, you know, was still doing that. And the board just felt they should continue doing all that they reasonably could. And this was a part of that. It's not... I don't know of any other case where the board has done this, has imposed a condition like this. And, well, unless there are... If the court has questions, but if it doesn't, I'll stop and just ask for affirmation and thank the court for its... Thank you, Mr. Strickland. All right. Mr. Diamond for rebuttal. Thank you. Briefly, we haven't discussed it during our oral argument, but we did challenge a third condition, which was the five-year time limit on the adjusted standard. I think our arguments on that are fully set forth in the briefs, and so I don't intend to discuss it further. But those are set forth in the brief, and we think that that's another condition that should be reversed. I'd like to address several of the things that were raised during Mr. Schmidt's argument. He said that the only limit on adjusted standard conditions for the board is the arbitrary and capricious standard. I don't think that can be right. There have to be other limitations. It has to be consistent with the Act. A condition about employee compensation is not consistent with the Act. The Act says nothing about the board having authority to do that. An adjusted standard condition that adds to the conditions for renewal adjusted standards is not consistent with the Act. It is not consistent with the Act to say that the board can restrict people's right to counsel. It doesn't say that they can't in the Act, but surely the Act does not allow that. Well, when you determine whether something is arbitrary or capricious, it has to be in context.  Yes. The context is the Act. I think that's exactly right. So what you're saying is that my argument is subsumed within the arbitrary and capricious standard, and perhaps it is. I think that there's something beyond arbitrary and capricious, which is that it has to be consistent with the Act. The point that Justice Schmidt made about the inability to measure the amount of ammonia coming from non-point discharges really underscores why this agricultural offset condition is arbitrary and capricious. If you can't measure how much is coming out of the agricultural fields, how do you figure out what the offset ratio is? You can't do it. The board never considered that problem. And despite what Mr. Schmidt said, as a matter of fact, there is nothing. There is nothing in the record that estimates what the amount of ammonia is coming off of green acre or black acre or any other acre on a farm. It is not in the record. Mr. Schmidt said, well, you know, if this agricultural offset becomes too difficult, they can get a variance. He's just flat out wrong. You get a variance from requirements of statutes or regulations. You don't get a variance from an adjusted standard condition. The fact of the matter is we shouldn't have to go in and seek additional relief for a condition that has no factual or procedural basis in the first place. The board should never have put this condition on because they don't have the factual basis in the record to do it. In fairness to Mr. Schmidt, variance, maybe it's not the proper term, but is there within the act to have a revisitation of this, of these conditions? Well, your honor, we could certainly, we could certainly, I suppose, apply for a modification to the adjusted standard. But again, we should not be put in the position of having to prove that a condition that has no factual or procedural basis is wrong. The board shouldn't have been able to do it in the first place. It is simply putting the cart before the horse to say that we now have to seek a modification of this adjusted standard and prove that the condition that the board put on had no factual basis. The board had no factual or procedural basis to impose this condition. What if they said, and would your argument be the same, if let's say there's XYZ business that's a point discharger a half mile down the river, and that can be measured, that point discharge, okay, saying you shut that plant down and we'll let you continue with yours? Okay. Because now we've gotten the measurement argument out of the way. So that might solve the measurement argument. I do think that there's one additional reason why we have said this condition is arbitrary and capricious. And that is, when you seek an adjusted standard, you're seeking an adjusted standard from a general regulation. Here it's a general regulation limiting ammonia discharges because of the impact of ammonia on dissolved oxygen in Illinois waterways. The condition that the board is trying to... It kills everything except Asian carbs. Frankly, it probably even affects the Asian carbs. That is positive. But the condition that the board is trying to put on is trying to solve this hypoxia issue. We don't think that the act allows the board to use its condition authority under the adjusted standard section as a broad... Let's solve any environmental problem in the nation. We think that the conditions have to be related to the issue that was addressed by the general effluent regulation for which you are seeking an adjusted standard. The Gulf hypoxia problem is simply too far afield from the general regulation from which we sought an adjusted standard. There has to be some sort of a connection there. Otherwise, it's just arbitrary and capricious that they pick us to try to solve a problem that we can't even solve. There has to be a connection there. This is just too far away. For that reason, we also think that this condition is arbitrary and capricious and would always be arbitrary and capricious. Well, you're assuming, and I'm not a scientist on this, you're assuming that if your point source discharge is 50 times greater than what's accepted by whatever standard that was created, okay, are they really addressing hypoxia or are they addressing the deviation that you have against that standard? You know that they were addressing hypoxia because the entire basis of Condition 2H was their discussion of the draft nutrient loss reduction strategy. The draft nutrient loss reduction strategy has nothing to do with the level of dissolved oxygen in Illinois rivers. It's about the Gulf hypoxia problem. That's how you know what the board was trying to do. The board told you. They were trying to solve the problem in the Gulf of Mexico and imposing this condition on us and only us to solve it. Okay, let's say they didn't mention the Gulf, Mexico, or hypoxia, but there's some report out there that talks about the acceptable and unacceptable levels of the oxygen in that Illinois river basin without any discussion about further south. Got it. Could they impose the same condition? I mean, they're talking about the condition trying to reduce the overall negative oxygen ratio in the Illinois river basin. I think the answer is possibly. The thing I would point out is that in this record, there's no discussion of a dissolved oxygen problem in the Illinois river. In fact, the Illinois river is not listed as impaired under the Clean Water Act for any parameter related to dissolved oxygen. I think it's rated as impaired, if I recall correctly, for PCBs and mercury. It is not listed as impaired. Then that's your strongest argument that it is really talking about south of New Orleans. Well, it's one argument that it's talking about south of New Orleans. The other argument is that the board made it expressed because they relied on that draft nutrient loss reduction strategy. The other thing that I would add is to go back to one of the things I said in my introduction. The board has found twice, not once, but twice, both in 2002 and in 2015, that while our discharge of ammonia is elevated, it causes no greater harm to the environment or to health than discharging at the general effluent standard. And they didn't do that just by waving their hands. They did it because we've done toxicity tests and shown that it's no more dangerous. We've measured the amount of ammonia in the Illinois River, and we've shown that we are not violating the water quality standards. Under the Clean Water Act, there's this effluent standard that was adopted by Illinois. That effluent standard is intended to help achieve the water quality standards, which are numeric standards that apply to the water body. We've done testing and shown that despite our discharge, the Illinois River meets those water quality standards for ammonia. So not only did the board find that there was no greater harm to the environment, they had a detailed factual basis to reach that conclusion. And so, yes, that is another reason that you know that this Condition 2H is all about their concern about the Gulf hypoxia zone, and it's not about dissolved oxygen. Thank you. We ask that you reverse the board's decision on those conditions. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement,  And with that, we will stand, recess, adjourn until the meeting is called. All right. Subject to call. Case number, this appellate board is now adjourned.